```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND

                                   :
LIBERTY MUTUAL GROUP, INC.
                                   :

    v.                             :    Civil Action No. DKC 12-0282

                                   :
CHRISTOPHER WRIGHT
                                   :
```

**MEMORANDUM OPINION**

Presently pending in this action is the "Petition to Appoint Neutral Umpire" filed by Petitioner Liberty Mutual Group, Inc. ("Liberty Mutual"). (ECF No. 1). The relevant issues are fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, each party will be directed to supplement its submissions regarding potential umpire candidates within fourteen days.

**I.   Background**

   **A.   Factual Background**

The following facts are uncontroverted. In February 2010, Liberty Mutual and Respondent Christopher Wright, a resident of Maryland, entered into a homeowner's insurance policy. The policy contains the following provision about determining the amount of loss to insured property upon occurrence of a triggering event at Mr. Wright's residence:

> **Appraisal.** If you [Mr. Wright] and we [Liberty Mutual] fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

(ECF No. 1-1, at 19).[1]

The policy also contains a section entitled "Conditions," which lists the requirements that Mr. Wright "must" satisfy "[i]n case of a loss to covered property." (*Id.* at 17-18). That section mandates, among other things, that Mr. Wright "[s]how the damaged property," "provide [Liberty Mutual] with records and documents [it] request[s]," and [s]ubmit to an examination under oath" as often as Liberty Mutual "reasonably require[s]." (*Id.* at 18). It further states that Mr. Wright must send to Liberty Mutual, "within 60 days after [its] request," a "signed, sworn proof of loss," setting forth various

---

[1] Because not all pages in the parties' exhibits contain page numbers, the page numbers cited in the memorandum opinion are those provided by the ECF system.

pieces of information, such as "[t]he time and cause of loss" and "[o]ther insurance which may cover the loss." (*Id.*).

On December 22, 2010, Mr. Wright's home and its contents suffered water damage due to a leaky pipe. Approximately one month later, Liberty Mutual sent Mr. Wright a copy of its proof of loss form and requested that he complete it. Mr. Wright did not comply with this request. Rather, on March 25, 2011, his insurance adjuster, Lawrence Goodman, submitted a personal property claim to Liberty Mutual using a different proof of loss form. (ECF No. 13-2).[2] Liberty Mutual notified Mr. Wright and Mr. Goodman shortly thereafter that Mr. Wright "must complete the Liberty Mutual Proof of Loss form as directed in . . . [earlier] correspondence." (ECF No. 13-3, at 2; *see also* ECF No. 13-4, at 2-3). It also provided Mr. Wright with another copy of the proof of loss form. (ECF No. 13-5). Mr. Goodman answered this letter on April 6, 2011, stating that he did "not understand why Liberty Mutual want[ed] to give [Mr. Wright] a hard time." (ECF No. 13-6, at 2). On April 15, 2011, Mr. Goodman notified Liberty Mutual that Mr. Wright had "decided to evoke the appraisal clause of the policy" and requested that Liberty Mutual name its appraiser "as soon as possible." (ECF

---

[2] Mr. Wright's claim for real property damage has been resolved and is not at issue in this action.

3

No. 13-7, at 2).  Mr. Goodman did not submit the proof of loss form requested by Liberty Mutual with this request.

Liberty Mutual responded to Mr. Wright's demand for appraisal on April 18, 2011.  Noting that it could not finalize its initial claim decision "due to [Mr. Wright's] refusal to provide" the proof of loss it had requested, Liberty Mutual "reject[ed]" the request for appraisal "at th[at] time."  (ECF No. 13-8, at 2).  It also asked to meet Mr. Wright at his home to review the property inventory that he had previously submitted.[3]  Mr. Wright refused Liberty Mutual's request to inspect his property.  Consequently, on April 27, 2011, Liberty Mutual again notified Mr. Wright that it could not "finalize [its] claims decision . . . due to [Mr. Wright's] refusal to provide the documents . . . requested [and his] refusal to provide access to inspect" the damaged contents of his home.  (ECF No. 13-10, at 2).[4]

On May 6, 2011, Mark Strong, one of Liberty Mutual's attorneys, sent a letter to Mr. Wright requesting that he submit to an examination under oath at a convenient date for both

---

[3] The letter also included the following statement:  "This letter should not be construed as a waiver . . . of any of the terms, conditions or defenses afforded by the policy or applicable law."  (*Id.*).

[4] This correspondence contained the same statement regarding waiver as Liberty Mutual's prior letter to Mr. Wright.

parties.  Mr. Wright sent correspondence to Mr. Strong on May 11, May 27, and June 17, 2011, agreeing to undergo the examination under oath and asking that Mr. Strong provide certain documents prior to that time.  On June 23, 2011, Mr. Strong informed Mr. Wright that he had not received this correspondence.  Approximately one month later, Mr. Strong proposed that the examination under oath take place during the last week of July or the first week of August.  Because Mr. Wright was unavailable during this time, he suggested meeting in late August.  The examination under oath was then scheduled for August 25, 2011, at Mr. Goodman's office.  "On the date set for the examination, no examination took place and instead it was agreed that certain payments would be made and certain inspections taken."  (ECF No. 13, at 7).  Two weeks later, on September 8, 2011, Liberty Mutual appointed an appraiser to represent it during the appraisal process.

The parties initially agreed to conduct the appraisal on October 28, 2011.  Before that date, each party submitted a list of potential umpires to the appraisers.  The appraisers, however, were unable to agree upon an umpire, and the appraisal did not take place as scheduled.  (ECF No. 14-1).  When the appraisers could not agree on an umpire by mid-November, Liberty

5

Mutual's appraiser informed Mr. Wright that Liberty Mutual would seek to have an umpire appointed by the court.[5]

### B.  Procedural Background

On December 8, 2011, Liberty Mutual filed its "Petition to Appoint Neutral Umpire" in this court, requesting that the court select an umpire to aid the parties' appraisers in valuing the loss to the contents of Mr. Wright's home. (ECF No. 1).[6]  It also submitted the names of four potential umpires with the petition.  Mr. Wright subsequently moved to dismiss the petition to appoint an umpire, answered the petition, and filed a counterclaim alleging that Liberty Mutual had breached the homeowner's insurance policy. (ECF Nos. 4-5).  In response, Liberty Mutual moved to strike the answer and counterclaim. (ECF No. 6).  On March 5, 2012, the court denied Mr. Wright's motion to dismiss, granted Liberty Mutual's motion to strike, and directed Mr. Wright to file an opposition to the petition

---

[5] In subsequent correspondence, Mr. Wright's appraiser stated that the appraisers should meet and attempt to agree on the amount of loss, only appointing an umpire if they were unable to reach an agreement regarding the amount of loss. Liberty Mutual's appraiser, believing that the appraisal provision required appointment of an umpire before the appraisal meeting, declined to meet to establish the amount of loss prior to the selection of an umpire.

[6] The case was originally filed as a "miscellaneous case," but it was subsequently converted to a "civil case" and placed on the civil docket.

within fourteen days. (ECF Nos. 11-12). On March 19, 2012, Mr. Wright opposed Liberty Mutual's request to appoint an umpire. Liberty Mutual has replied to Mr. Wright's opposition.

**II. Analysis**

Mr. Wright has opposed Liberty Mutual's request for appointment of an umpire on two grounds. First, he contends that Liberty Mutual waived the right to participate in the appraisal process, principally because it failed to appoint an appraiser within the twenty-day window provided in the insurance policy. Second, he objects to the umpire candidates proposed by Liberty Mutual, asserting that they are either "not competent" to appraise personal property or are "not impartial" (ECF No. 13, at 12-13). He has submitted his own list of potential umpires with his opposition papers. Liberty Mutual disputes Mr. Wright's waiver argument and generally opposes his umpire candidates.

    **A.  Waiver of Appraisal**

In the opinion issued on March 5, 2012, the court concluded that the Federal Arbitration Act ("FAA") applies to the appraisal provision at issue in the present action. (ECF No. 12, at 11-18). Under the FAA, "a party loses its right . . . to arbitrate if it is 'in default in proceeding with . . . arbitration.'" *Forrester v. Penn Lyon Homes, Inc.*, 553 F.3d

7

340, 342 (4th Cir. 2009) (quoting 9 U.S.C. § 3). "[D]ue to the strong federal policy favoring arbitration, [however,] courts have limited the circumstances that can result in statutory default." *Id.* at 342-43 (citing *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985)). For this reason, waiver of the right to arbitrate is "not to be lightly inferred," and "the party opposing arbitration bears a 'heavy burden of proving waiver.'" *MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 249-51 (4th Cir. 2001). Thus, "any doubts concerning [arbitrability] should be resolved in favor of arbitration, whether the problem at hand is . . . an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159, 1164 (5th Cir. 1987) (explaining that there is a "presumption against" finding that a party has waived its right to seek arbitration).

Although waiver typically arises in circumstances where one party "so substantially utilize[es] the litigation machinery" that subsequent arbitration would prejudice the opposing party, *Maxum Founds., Inc.*, 779 F.2d at 981, "it is clear that conduct . . . manifesting an abandonment of [the] arbitration forum [itself] can constitute" waiver, *Brownyard v. Md. Cas. Co.*, 868

8

F.Supp. 123, 127 (D.S.C. 1994). To waive arbitration in such situations, a party must (1) know of an existing right to arbitration, (2) act inconsistently with that right, and (3) cause prejudice to the opposing party through these inconsistent acts. *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 934 (9th Cir. 2011); *see also Am. Heart Disease Prevention Found., Inc. v. Hughey*, 106 F.3d 389, 1997 WL 42714, at *3 (4th Cir. 1997) (unpublished table opinion) (explaining that a party had not waived its right to arbitration because its "activities were not inconsistent with a desire to arbitrate" and it "ha[d] not demonstrated the type of prejudice required to establish waiver"). Here, the parties' dispute centers on the second prong.

Mr. Wright relies heavily on Liberty Mutual's express "reject[ion]" of his request for appraisal to demonstrate that Liberty Mutual waived arbitration. (ECF No. 13, at 11 (quoting ECF No. 13-8, at 2)). Courts considering similar circumstances, however, have looked beyond a party's mere statement refusing arbitration to the facts of the particular case in determining whether waiver actually occurred. *See, e.g.*, *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 574 (6th Cir. 2003) (concluding that a party's statement "declin[ing] at that point to agree to arbitration or other

9

alternative dispute resolution" was insufficient to demonstrate waiver (internal quotation marks and brackets omitted)); *Lubrizol Int'l, S.A. v. M/V Stolt Argobay*, 562 F.Supp. 565, 572 (S.D.N.Y. 1982) (finding that a party's agreement to pursue certain claims in court did not constitute waiver, particularly given that the agreement included a statement that "none of [the party's] rights or defenses [were] to be regarded as waived"); *cf. Brownyard*, 868 F.Supp. at 126 (reasoning that "waiver . . . cannot be determined by an inflexible rule and depends on all of the circumstances of the particular case"). Accordingly, Liberty Mutual's statement that it would not undergo appraisal "at th[e] time" initially requested by Mr. Wright could only constitute waiver if the facts demonstrated that Liberty Mutual's actions were otherwise inconsistent with the right to arbitrate. (ECF No. 13-8, at 2; ECF No. 13-10, at 2).[7]

Mr. Wright asserts that Liberty Mutual's delay in appointing an appraiser – nearly four months beyond the twenty-day window provided in the insurance policy – was wholly inconsistent with the right to arbitrate. An insurance company's unexplained delay in proceeding to arbitration may

---

[7] This conclusion is particularly appropriate given that the letters at issue expressly stated that they "should not be construed as a waiver . . . of any of the [policy's] terms, conditions or defenses." (ECF No. 13-8, at 2; ECF No. 13-10, at 2).

10

constitute an act inconsistent with the right to seek arbitration. *See Brownyard*, 868 F.Supp. at 126-27 (concluding that an insurance company waived arbitration when it "stalled the progress of [ongoing] arbitration" by ignoring an insured's "repeated telephone calls and letters" regarding settlement). But where the facts indicate that the insured party has contributed to the delay, a finding of waiver is inappropriate. *See Burns v. Imagine Films Entm't, Inc.*, 108 F.3d 329, at *3 (2[d] Cir. 1997) (unpublished table opinion) (declining to find that a defendant had waived arbitration rights, particularly where "plaintiffs may themselves have contributed to the delay in seeking arbitration"); *Acquaire v. Canada Dry Bottling*, 906 F.Supp. 819, 830 (E.D.N.Y. 1995) (concluding that the defendants had not waived arbitration where the delay at issue could "[]not fairly be attributed to the defendants," given that "virtually all of the lapse of time ha[d] been caused by the plaintiffs"); *cf. Media Edge v. W.B. Doner, Inc.*, 112 F.Supp.2d 383, 385 (S.D.N.Y. 2000) (explaining that where "other forces [beside dilatory conduct] contributed to . . . [a] delay, th[e] lapse of time [was] not . . . itself enough to infer waiver").

According to Mr. Wright, Liberty Mutual delayed its appointment of an appraiser by requiring him to complete its proof of loss form and by failing to respond to his inquiries

11

regarding the request for an examination under oath.  Labeling these circumstances as "various tactics of delay," Mr. Wright contends that Liberty Mutual deliberately sought to delay appraisal in order to avoid paying his claim.  (ECF No. 13, at 10).  The evidence proffered by Mr. Wright, however, fails to meet the "heavy burden" needed to demonstrate that waiver occurred.  *Microstrategy, Inc.*, 268 F.3d at 251 (internal quotation makes omitted).

At the outset, it is not clear that Liberty Mutual's request that Mr. Wright complete its own proof of loss form or its lack of response to questions about the examination under oath was inconsistent with the right to arbitrate.  In fact, the evidence contains explanations justifying both circumstances.  With regard to the proof of loss form, the insurance policy states that Mr. Wright must provide Liberty Mutual with the "records and documents [it] request[s]."  (ECF No. 1-1, at 18).[8]  According to Liberty Mutual's correspondence with Mr. Wright, it could not "finalize [its] claims decision" until he completed this proof of loss form.  (ECF No. 13-8, at 2).  Liberty Mutual

---

[8] Mr. Wright also asserts that the "oath" in Liberty Mutual's proof of loss form "violates the requirement for the form of an '[o]ath'" as set out in section 1-208 of the Maryland Insurance Code.  (ECF No. 13, at 3).  Because this contention has no bearing on Mr. Wright's assertion that Liberty Mutual waived arbitration, it need not be resolved here.

asked Mr. Wright to complete the form in January 2011, two months prior to submission of his personal property claim. Mr. Wright nonetheless submitted a different proof of loss form with his claim, and when Liberty Mutual again requested that he complete its form, Mr. Wright was unwilling to do so.[9] Indeed, the record does not indicate if or when he submitted that form to Liberty Mutual.

With regard to the unanswered inquiries about the examination under oath, Mr. Wright states that Liberty Mutual attempted to delay the appraisal by failing to respond to three letters for approximately six weeks in May and June 2011. The evidence is, however, that Mr. Strong informed Mr. Wright in June 2011 that he did not receive at least two of these letters. Doubt thus remains as to whether this failure to respond was inconsistent with the right to arbitrate, and any such doubt must be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25; *cf. MicroStrategy, Inc.*, 268 F.3d at 251-52 (reasoning that proof of waiver "must be concrete, not merely speculative").

Mr. Wright's waiver argument based on the four-month delay also suffers from a larger problem – namely, that his refusal to

---

[9] This evidence also suggests that Mr. Wright may have contributed to Liberty Mutual's delay in appointing an appraiser.

13

permit Liberty Mutual to inspect the damaged contents of his home likely contributed to most of Liberty Mutual's delay in appointing an appraiser. The insurance policy requires Mr. Wright to "[s]how the damaged property" upon Liberty Mutual's request. (ECF No. 1-1, at 18). When Liberty Mutual made such a request, on April 18, 2011, Mr. Wright declined to permit the inspection. Liberty Mutual thereafter informed Mr. Wright that it could not "finalize [its] claims decision" – a prerequisite to the appraisal process – "due to [Mr. Wright's] refusal to provide access to inspect" the damaged property. (ECF No. 13-10, at 2; ECF No. 1-1, at 19). The record does not clearly indicate when this inspection ultimately took place, but Mr. Wright's opposition states that the parties finally agreed on August 25, 2011 – just two weeks before Liberty Mutual appointed its appraiser – "that . . . certain inspections [would be] taken." (ECF No. 13, at 7). Thus, Mr. Wright's refusal to permit inspection of his property at minimum contributed to, if not caused, virtually the entire delay between his initial request for appraisal and Liberty Mutual's appointment of an appraiser. *See Acquaire*, 906 F.Supp. at 830.[10] Accordingly, he

---

[10] Mr. Wright also contends that the request from Liberty Mutual's appraiser to appoint an umpire prior to the appraisal meeting was another instance of delay and an action inconsistent with the right to arbitrate. Mr. Wright emphasizes that the

has failed to demonstrate that Liberty Mutual waived the right to arbitration.[11]

### B.   Appointment of Umpire

Both Liberty Mutual and Mr. Wright have proposed four umpire candidates to the court.  Each party has also generally objected to the qualifications or impartiality of the candidates proposed by the other party.  Accordingly, in order to enable

---

appraisal provision does not expressly require appointment of an umpire prior to the meeting of the appraisers.  The insurance policy, however, is ambiguous regarding whether the umpire's appointment should precede appraisal.  Indeed, while it does not expressly state that appraisal cannot occur prior to selection of an umpire, the policy sets forth the procedure for appointing both the appraisers and the umpire before explaining the process that they will subsequently follow in setting the amount of loss.  Therefore, it is – at best - unclear at what point an umpire must be appointed under the policy.  In light of this ambiguity, a finding of waiver on this basis is inappropriate.  *Cf. Lubrizol Int'l, S.A.*, 562 F.Supp. at 572 (reasoning that ambiguity in an agreement between the parties regarding resolution of claims in court counseled against a finding of waiver).

[11] The facts of the present action render it distinguishable from *Sucrest Corp. v. Chimo Shipping Ltd.*, 236 F.Supp. 229 (S.D.N.Y. 1964), a case on which Mr. Wright relies in contending that Liberty Mutual has waived the right to arbitrate.  In *Sucrest*, the court concluded that a party moving for summary judgment due to the opposing party's failure to arbitrate had waived arbitration by itself ignoring the arbitration process for the six-month window specified in the contract.  Unlike in *Sucrest*, the evidence here indicates that Liberty Mutual did not ignore the appraisal provision or deliberately seek to avoid appraisal.  Rather, until Mr. Wright provided certain documents and permitted Liberty Mutual to inspect his property, Liberty Mutual could not conclude its evaluation of his claim, a necessary step before proceeding to appraisal.

15

the court to appoint a suitable umpire so that the parties may undergo appraisal and resolve Mr. Wright's personal property claim, the parties will each be directed to submit to the court five to ten additional umpire candidates within fourteen days of the issuance of the accompanying Order. These submissions should be made *ex parte* and should specify the name, contact information, and qualifications of the proposed candidates.

### III. Conclusion

For the foregoing reasons, both parties will be directed to supplement their prior submissions regarding potential umpire candidates within fourteen days. A separate Order will follow.

                                                              /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge